

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00158-CV

_____

IN THE INTEREST OF O.S. AND U.S., CHILDREN

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 18-0987-393

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant A.H. (Mother) and Appellee I.S. (Father) divorced in 2014, and they were appointed as joint managing conservators of their two sons—O.S. (Owen) and U.S. (Uriah)—with Mother having the exclusive right to determine the children's primary residence. In the years that followed, Mother remarried, then after separating from her new spouse, she and the children began living with L.W.B. (Partner).[1] Both Mother and Father petitioned to modify the custody order based on the changed circumstances, and the trial court—after hearing evidence of each parent's alleged misdeeds, of Owen's medical issues, of Uriah's educational arrangements, and of Partner's background and social-media posts—found that the children's best interest would be served by giving Father the exclusive right to decide their primary residence, their education, and their invasive medical procedures.

Mother challenges this modification, raising three issues. Her primary complaint is that there was insufficient evidence to support the modification because no reasonable factfinder could have believed Father or taken Partner's social-media posts seriously. Therefore, Mother reasons, the modification must be attributable to the trial court's unconstitutional "punishment" of her based on Partner's transgender

---

[1]Although Partner self-identified as a female, multiple witnesses—including both Partner and Mother—testified that "legally, [Partner's] a male." We therefore use male pronouns for Partner to avoid confusion. *Cf. Hobdy v. State*, Nos. 02-18-00342-CR–02-18-00347-CR, 2019 WL 3755781, at *1 n.1 (Tex. App.—Fort Worth Aug. 8, 2019, no pet.) (mem. op., not designated for publication) (referencing male identifying as woman with male pronouns to avoid confusion).

identification and exercise of his right of free speech. But such allegations merely seize on a tangential hot-button issue in an attempt to avoid the trial court's credibility determinations. The trial court heard conflicting evidence of two imperfect parents, and it acted within its discretion based on its assessment of the witnesses' credibility. As for Mother's remaining two appellate issues, one—a challenge to the trial court's time-management rules—is not preserved, and the other—a challenge to the denial of Mother's motion for new trial—lacks a legal basis. Accordingly, we will affirm.

## I. Background

The parties divorced in October 2014, and the divorce decree established the custody arrangements for the couple's two sons. As relevant here, the decree appointed Mother and Father as joint managing conservators, it gave Mother the exclusive right to establish the children's primary residence, and it gave each parent the independent right to make educational decisions for the children and to consent to their invasive medical procedures. The decree also recited several agreed provisions, including a "Morality Clause" that reflected "[t]he parents['] agree[ment] that no unrelated person of the opposite sex with whom the parent is involved in an intimate relationship shall spend the night when the children are in the parent's care."

Several years later, Father petitioned to modify the custody arrangement based on changed circumstances. *See* Tex. Fam. Code Ann. § 156.101(a)(1). He sought the exclusive right to designate the children's primary residence and to make certain educational and medical decisions for them. Mother responded with a counterpetition

3

to modify, agreeing that the circumstances had changed and requesting the exclusive right to make some of the children's medical decisions. The competing petitions were tried to the bench in 2022.

## A.    Time-Management Rules

At trial, the trial court imposed several time-management rules, including a rule related to how many times each witness could be questioned. The court informed the parties that, for any given witness, the parties could each question the witness a maximum of two times, and after that, the witness would be released. The court noted that this two-rounds-each limitation was a "known rule in [its] Court." And based on the rule, it released one of the witnesses—Mother's estranged husband, M.W. (Husband)[2]—after he had been questioned twice by each party. When Mother asked that Husband not be released, the trial court reminded Mother of the two-rounds-each rule, and Mother's counsel responded, "Okay, Your Honor." Mother's counsel did not object, request an exception to the rule, or make an offer of proof showing the other questions Mother might have asked Husband.

But later, when Mother began her case-in-chief, Mother's counsel asked the trial court to make an exception to the two-rounds-each rule for a different witness: Mother herself. Although Mother had already been questioned twice by each side as part of Father's case in chief, Mother's counsel explained that he had not realized the

---

[2]Mother and Husband separated in 2017 but remained legally married at the time of the 2022 trial.

4

rule would apply to testimony from the parties, and he asked that Mother be permitted to retake the stand. The trial court granted the exception and allowed Mother fifteen minutes for a third round of direct examination. Mother's counsel repeatedly expressed gratitude for the exception, saying, "Thank you, Your Honor." Mother did not object to the time-limited nature of the exception, she did not ask for more time, and she did not make an offer of proof showing any additional testimony she might have offered.

## B.     Evidence at Trial

Although there were many contested issues at trial, the fact that things had changed since the 2014 divorce decree was not disputed. The evidence showed that

- in 2015, Mother began a relationship with Partner, and he began living with her and the children;

- in 2016, during a "break" in Mother's relationship with Partner, Mother married Husband, and she and the children moved in with Husband;

- in 2017, Mother and Husband separated, and she moved out with the children; and

- later in 2017, Partner moved in with Mother and the children.

Against this backdrop, the parties vehemently disputed (1) Mother's failures to surrender possession of the children;[3] (2) the children's medical incidents and education; and (3) Partner's influence on the children.

---

[3]Father also requested, and the trial court ordered, sanctions against Mother based on, among other things, her failure to appear for scheduled visitations and her violation of the Morality Clause. The sanctions are not before us on appeal. Although

5

### 1.    Possession of Children

Mother admitted that, on at least three occasions in late 2018 and early 2019, she had failed to surrender possession of the children for Father's scheduled visitations. Mother implied that such failures were justified, though, explaining that, on at least one of the occasions, she had failed to surrender possession "upon the advisement of [her] attorney" because she had heard of a Child Protective Services (CPS) investigation involving Father's home. Father later explained that the CPS investigation related to children who had been placed in his home, meaning that he was "a placement, verified and approved by CPS." Regardless, Father alleged that Mother had failed to surrender possession on more occasions as well, and he provided documentation showing that he had reported Mother's actions to the police.

Father also elicited related testimony from the stepmother of two of Mother's other children (Half-Stepmother).[4] Half-Stepmother had coordinated with Mother regarding custodial hand-offs, and she confirmed that there had been a period of approximately "three or four years" in which Mother had withheld visitation of those children from their father. However, Half-Stepmother blamed Father for the withholding, testifying that the withholding had occurred during Mother's relationship

Mother lists the sanctions-related findings of fact among those she disputes, her appellate issues focus on the custody modification, and she does not request reversal of the sanctions order.

[4]Half-Stepmother testified that she had since divorced the father of Mother's two other children. For ease of reference, though, we refer to her as Owen and Uriah's Half-Stepmother.

with Father and that Father had believed that Half-Stepmother and her husband—the father of Mother's two other children—were a bad influence.

Mother, meanwhile, presented evidence that Father had threatened to take the children to Canada. Father admitted making the statement but claimed that he had not been serious, explaining that Mother had speculated about such flight because he spoke French, so it had become "a running joke" between him, his wife, and his mother.

### 2. Children's Medical Incidents and Education

Father also presented evidence that Owen had suffered multiple medical incidents since the 2014 divorce decree, though the nature and cause of the incidents was contested:

- In 2016, Owen injured his arm. Father testified that Owen had fallen from playground equipment at school and broken his arm, that the school had not been able to get in touch with Mother to notify her, that Owen had been groaning in pain in the hours that followed, that Mother had downplayed the injury as "a bump on his elbow," and that Mother had dropped Owen off for a visitation with Father rather than seeking treatment. Mother protested that Owen had not given any indication that his arm had been injured. She further denied that Owen's arm had been broken, stating that the doctors "put a cast on him as a precaution until they did a second set of x-rays" and that "[t]he x-rays never showed a visible fracture."

- In 2018, Owen required hospitalization for a week and a half. The medical records admitted into evidence at trial revealed that he had suffered from a urinary tract infection, a kidney infection, and sepsis. Father claimed that these issues were the result of Owen's being "deprived of water and food" at Mother's house and that such deprivations led to internal stool build-up.

Mother denied that any deprivations had occurred, and she described what Owen had eaten in the days before his hospitalization.[5]

- In 2019, Owen suffered what Father described as an asthma attack. Father claimed that Owen had arrived for visitation in the midst of the attack and that he had required treatment in the intensive care unit. Owen's medical records documented the hospital stay, attributing it to "severe croup from Influenza." Mother did not address the subject.

Father painted these incidents as indicative of Mother's neglect, while Mother disputed that she was to blame for Owen's medical ailments.

In addition to Owen's medical care, Father also expressed concern regarding the children's education. Although Owen had been attending public school at all relevant times, Mother had been homeschooling Uriah for several years. Father noted that when Mother had homeschooled one of her older children in the past, that child had "ended up two and a half years behind in school as a direct result." Mother, however, explained that she had homeschooled Uriah because, during COVID, "[t]he CDC recommended that you take extra precautions with people who have ADHD," and she confirmed that she had re-enrolled Uriah in public school a few months before trial.

### 3.    Partner's Influence

Another of Father's concerns related to Partner's influence on the children. Specifically, Father pointed to Partner's background, his treatment of the children, his alleged instability, and his social-media posts.

---

[5]Half-Stepmother—who had visited Mother's house not long before Owen's hospitalization—confirmed that Owen had appeared to be in good health.

### a. Background

Partner was a biological male who identified as a female. He openly admitted that he had been involved in the sex industry in the past, stating that, before his relationship with Mother, he had spent approximately "[a] year and a half or two years" working as a prostitute through Craigslist advertisements. Around that same time, Partner had performed live online "stripping" shows from his home. But Partner noted that he had stopped such work before he began his relationship with Mother and that Mother had indicated they could not live together if Partner resumed prostitution.

Mother, for her part, questioned the sincerity of Father's concern about Partner's work in the sex industry. She elicited testimony that she and Father had met at a BDSM[6] event and that Father had worked with a filmmaker who had produced BDSM videos. In fact, Mother noted, a least one of Father's other children had been involved in a political film made by the filmmaker, and although the film had not been sexual, it had been advertised on the filmmaker's website alongside the filmmaker's sexual content.

---

[6]BDSM was not defined by any of the witnesses, and when one witness was asked what it meant, he described it as "bondage." *Cf. BDSM*, Merriam-Webster, https://www.merriam-webster.com/dictionary/BDSM (last visited Feb. 27, 2025) (identifying BDSM's etymology as "*b*ondage, *d*iscipline, *s*adism, *m*asochism" with "[t]he *d* and *s* hav[ing] also been taken to stand for *dominance* and *submission*," and defining the term as "sexual activity involving such practices as the use of physical restraints, the granting and relinquishing of control, and the infliction of pain").

Mother also questioned the propriety of Father's relationship with his wife. Mother's counsel repeatedly referred to Father's wife as his "niece,"[7] which label Father disputed, though he conceded that "[his] mother and [his wife's] grandfather [we]re a couple." Father clarified, though, that his wife was not his mother's child and that there was "[n]o genetic[] no[r] biological connection" between them.

As for Partner, his work in the sex industry was not the only area of his background that Father highlighted:

- Partner admitted that, in approximately 2011, the Federal Bureau of Investigation (FBI) had raided his home and seized his hard drives because he "had some contact with [a] hacker group" that, according to Partner, he had been writing an article about.

- Partner confirmed that more than one person had accused him of rape.[8] However, Partner denied ever having committed rape, and he testified that one of his accusers—a woman who had posted a blog about the alleged rape—had lodged the accusation because Partner "banned her from a Minecraft server."

### b. Treatment of the Children

Partner's background provided context for Father's belief that Partner was mistreating the children. Father testified that, around the time Partner began living with Mother and the children, Owen and Uriah began experiencing "night terrors"

---

[7]Mother's cross-examination of Father hinted that Father's wife was young enough to be his daughter, even implying that Father had considered adopting his wife prior to their marriage. But Mother did not present evidence of Father's wife's age, and Father denied ever having contemplated such an alleged adoption.

[8]These rape allegations were also referenced in the trial exhibits of Partner's social-media posts. In response to one of Partner's Twitter threads, an account named "Speaking Out" had tweeted, "[Partner] sexually abused me. I was 14, and [Partner] knew it."

and Owen began "wetting the bed consistently." Father speculated that Partner might be sexually abusing Owen, but Mother hinted that Father's allegations had required Owen to submit to an invasive examination.

Father presented evidence of other alleged mistreatment of the children as well. According to Father, at the time of Owen's hospitalization in 2018, Owen had reported that Partner had been punishing him by "not letting him get off the bed, not allowing him to go to the bathroom, [and] not allowing him to have water." Both Mother and Partner denied having deprived Owen of food or water or having limited his access to the bathroom.

### c. Instability

On top of Partner's background, Father presented evidence of Partner's instability. Partner confirmed that he had post-traumatic stress disorder and borderline personality disorder and that, although he had been medicated for his conditions in the past, he had gone off of his medications at certain points in time and was not taking such medications at the time of trial. As it related to his borderline personality disorder, Partner explained that his medication was no longer necessary because he had completed treatment and had been "cured."[9]

---

[9]Partner's social-media posts referenced his mental-health issues as well. In a series of tweets, he stated that he "ha[d] ptsd/bpd," "c[ould]n[']t be employed," and suffered from "black and white thinking" such that "[p]eople [he] s[aw] as evil ma[d]e [him] so angry to the point of being irrational." He linked these issues to his status as a "former sex worker," stating that he "had to do full service sex work to survive."

Father also noted that, although Partner had been living with Mother for seven years, the two were not married; Mother remained married to Husband. Mother explained that she had not divorced Husband because doing so would divert "money and resources" away from the custody case. She confirmed that, if and when she divorced Husband, she intended to marry Partner. Partner, meanwhile, testified that he was not sure how many husbands Mother had been married to and "ha[d]n't really paid that much attention" because he "just d[id]n't care enough to really worry about it."

### d. Social-Media Posts

Partner's social-media posts were another source of Father's concern. Father presented evidence that Partner was very active on social media—particularly on Twitter:[10]

- One of Partner's tweets had stated, "[I]f you take every rich person on the planet and puree them into a liquid and let that liquid ferment for a few months, it makes lovely fertilizer for plants."

- Another of Partner's Twitter threads had discussed "TERFs," which Partner testified referred to "[t]rans-exclusionary radical feminist[s]." Partner had tweeted that "the trans community has been too nice to terfs for too long"; that "every time a TERF opens their mouths [if] they got a fist in it[,] they wouldn[']t open their f***ing mouths"; and that "[w]hat you do is get you a baseball bat and write 'transmisogyny corrector' on it and you whap the next terf who says sh**."

- Another series of tweets had identified Father by name, labeling him "anti antifa," calling him a "stalker a**hole," and stating that Partner was "not gonna hide from his fascist a**."

---

[10]Trial occurred in 2022, prior to Twitter's rebranding as X.

12

- Another of Partner's tweets had advocated "f\*\*\*ing up the personal and professional lives of fascists."

- A Twitter poll that Partner had created asked individuals to vote whether, "if you see ten people beating up an ICE agent, . . . you either make it 11 or make popcorn."

- Another had asserted that "[y]ou could literally cover ICE agents with fire ants and still have the moral high ground." A similar tweet had applied the fire ants to "[f]ascists."

- Another had stated, "[I]f you are a fellow white woman wanting to know how to get other white women to stop voting for [a certain political candidate], what you have to realize is dead Nazis can't vote." The tweet had gone on to state that "it's not hard to slip something into her Mimosa at brunch."

- Another tweet claimed to have "stop[ped] my neighbor from voting for [a certain political candidate] by threatening to throw him through a window."

Partner did not deny posting these statements, though in many instances he testified that he did not remember doing so, explaining that he had used multiple Twitter accounts since 2017. Regardless, Partner characterized the posts as non-violent, stating that he had "a very dark sense of humor" and that the posts had been intended as tongue-in-cheek jokes.

One social-media post that Partner did not describe as a joke, though, was on Facebook. There, in a Facebook group that Partner moderated, he had identified Father by name, shared links to Father's personal and professional Facebook pages, and labeled Father as "a fascist, . . . a white supremacist, a racist, a rapist[,] and an all[-]around vile human being" who "hates trans women . . . [and] antifa." The Facebook post had ended with Partner asking others to "do [him] a favor and make this racist

13

[referring to Father] afraid again." When asked at trial if the Facebook post had been serious, Partner smiled and confirmed that it had been serious "because the statements were true."[11]

Father claimed that the Facebook post had extensive ramifications. He testified that, after the post, he "had more than a hundred phone calls come into [his] job until [he] was fired," and he "was kicked out of [his] church, lost [his] Scout troop, lost [his] website, lost [his] business, [and] lost many friends."[12] But Partner denied that he had intended for the Facebook post to "encourag[e] people to go to [Father's] Facebook [page] and screw with him."

As for Mother, she stated that she had not followed Partner's social-media posts and that, when she learned of the Facebook post in particular, she had asked Partner to delete it. Mother insisted that Father had been the one making ill-advised statements, emphasizing that Father had disparaged her to medical personnel and in the children's presence. Indeed, Father admitted as much, and some of his statements were documented in Owen's medical records. Mother explained that she sought modification of Father's involvement in medical decisions because Father "ke[pt] using the contact that he ha[d] with doctors to try to frame [her] for things."

---

[11]At another point, Partner testified that he had never spoken with Father and that he had no opinion on his skills as a parent.

[12]Husband, too, testified that he believed there had been "a coordinated effort" by Partner to ban Father from Facebook.

### 4. Trial Court's Interviews

After the parties finished presenting their evidence, the trial court interviewed Owen and Uriah, who were then 13 and 11 years old respectively. *See* Tex. Fam. Code Ann. § 153.009(a), (b). As particularly relevant here, the children confirmed that they had not been physically or sexually abused by any adult at either parent's home.

## C. Modification Order

Based on the trial evidence and interviews, the trial court granted Father the exclusive right to designate the children's primary residence, to make decisions about the children's education, and to consent to their invasive medical procedures. The court later entered findings of fact and conclusions of law, which included

- a finding that Mother had cohabitated with Partner while married to Husband and while the children were in her care;

- the conclusion that "[t]he circumstances . . . ha[d] materially and substantially changed" in light of the parties' relocations, Mother's remarriage, Mother's relationship with Partner, Mother's failure to meet the children's medical and educational needs, and Partner's "pos[ing] a risk to the welfare of the children"; and

- multiple findings that Partner "behaves and speaks in a minacious[,[13]] . . . bilious[,[14]] . . . hyperbolic[,[15]] . . . [and] corybantic[[16]] manner

---

[13]"Minacious" means "of a menacing or threatening character." *Minacious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/minacious (last visited Feb. 27, 2025); *see Minacious*, Webster's Third New International Dictionary (reprt. 2021) (1961) (same).

[14]"Bilious" means "of or indicative of a peevish ill-natured disposition." *Bilious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/bilious (last visited Feb. 27, 2025); *see Bilious*, Webster's Third New International Dictionary (reprt. 2021) (1961) (similar).

in the presence of the children[,] or in a manner that can affect the children's emotional or psychological development"; and

- the conclusion that modifying the custody order was in the children's best interest.

## D.  Motions for New Trial

Mother hired new counsel and moved for a new trial, arguing that there was additional evidence that her trial counsel had not presented. The trial court rejected this argument and excluded much of Mother's new-trial evidence because it either "could have been introduced at the time of trial and w[as] not" or it involved post-judgment events.[17] Nonetheless, the court held a multi-hour hearing on the new-trial motion, allowing Mother to walk through her evidence, though much of it was

---

[15]"Hyperbolic" means "of, relating to, or marked by language that exaggerates or overstates the truth." *Hyperbolic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hyperbolic (last visited Feb. 27, 2025); *see Hyperbolic*, Webster's Third New International Dictionary (reprt. 2021) (1961) (defining "hyperbolic" as "of, characterized by, or given to hyperbole"); *see also Hyperbole*, Webster's Third New International Dictionary (reprt. 2021) (1961) (defining "hyperbole" as "extravagant exaggeration that represents something as much greater or less, better or worse, or more intense than it really is or that depicts the impossible as actual").

[16]"Corybantic" means "being in the spirit or manner of a Corybant," i.e., "wild" or "frenzied." *Corybantic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/corybantic (last visited Feb. 27, 2025); *see Corybantic*, Webster's Third New International Dictionary (reprt. 2021) (1961) (similar); *see also Corybant*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Corybant (last visited Feb. 27, 2025) (defining "Corybant" as "one of the attendants or priests of Cybele noted for wildly emotional processions and rites").

[17]The trial court explained that Mother's reliance on post-trial events amounted to "an attempt to collapse or to cause a motion to modify, which is a new proceeding."

presented as offers of proof. As Mother proceeded with her offers of proof, the trial court sustained additional objections to the already-excluded evidence, noting that even if the evidence had been offered at the time of trial, portions of it would have been excluded as irrelevant, as hearsay, or based on other evidentiary flaws. After hearing Mother's argument and evidence, the court orally denied her new-trial motion. However, it signed a corrected modification order that remedied other issues with the original judgment.[18]

So Mother challenged the corrected modification order with a second new-trial motion that added a host of additional arguments to those raised in her first. As relevant here, Mother argued that the trial court's two-rounds-each rule had limited her ability to present her case and that the trial court had abused its discretion by "focusing" on Partner's political statements in violation of his right of free speech. Once again, the trial court held an evidentiary hearing on the motion and allowed Mother to present her evidence and offers of proof. The court also took judicial notice of the evidence and offers of proof that Mother had presented at the first multi-hour new-trial hearing. It then denied the second request for a new trial.[19]

---

[18]The corrected modification order added, among other things, (1) a provision recognizing Mother's right to consent to psychiatric and psychological treatment of the children, subject to Father's agreement; (2) a provision clarifying Father's obligation to consult with Mother regarding medical and educational decisions and to advise her of material events; and (3) Mother's updated contact information.

[19]After Mother appealed the modification order, the trial court transferred the underlying suit to Johnson County, which is outside of this court's appellate

## II. Discussion[20]

Mother argues that the trial court abused its discretion by (1) modifying the custody arrangement based on legally and factually insufficient evidence; (2) imposing its time-management rules; and (3) denying her second motion for new trial.[21]

### A.    Modification Findings: Evidence Sufficient

In her primary issue, Mother asserts that there was legally and factually insufficient evidence to support the trial court's dispositive modification findings: (1) that there had been a material and substantial change in the parties' circumstances and (2) that the modification was in the children's best interest.[22]

---

jurisdiction. *See* Tex. Gov't Code Ann. § 22.201(c), (k). We notified the Texas Supreme Court of this development and requested that the appeal be transferred to the Tenth Court of Appeals in Waco. The Texas Supreme Court denied our request.

[20]Father filed an appellee's brief, but because it did not comply with the Texas Rules of Appellate Procedure, we requested a corrected brief. *See* Tex. R. App. P. 38.1, 38.2(a)(1). Father's corrected brief lacks an argument section entirely, *see* Tex. R. App. P. 38.1(i), 38.2(a)(1), and Mother has moved to strike the brief. Our disposition of this appeal renders Mother's motion moot because, even without considering Father's brief, Mother has not identified a preserved, reversible error in the modification order. *See* Tex. R. App. P. 47.1.

[21]Mother does not identify which motion for new trial she is referencing; portions of her argument refer to the first while other portions refer to the second. Because her second motion incorporated the first motion's arguments, evidence, and offers of proof, we construe Mother's appellate issue as a challenge to the second motion for new trial.

[22]Mother complains of many of the trial court's other findings as well, but such findings are not dispositive, so we need not address them to resolve the appeal. *See* Tex. R. App. P. 47.1.

### 1.      Standard of Review and Governing Law

A custody order may be modified when (1) the circumstances of the children, a conservator, or another party affected by the order have materially and substantially changed since the order's rendition; and (2) modification would be in the children's best interest. Tex. Fam. Code Ann. § 156.101(a)(1); *see In re J.R.*, No. 02-23-00071-CV, 2024 WL 191211, at *3 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (clarifying that "[t]he person seeking modification has the burden"). We review a trial court's modification of a custody order for an abuse of discretion. *In re R.R.K.*, No. 02-20-00302-CV, 2022 WL 1257136, at *3 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.).

A trial court abuses its discretion if it acts arbitrarily or unreasonably, such as by issuing a ruling based on legally or factually insufficient evidence. *See id.* at *4. The factual-sufficiency analysis often resolves the legal-sufficiency issue as well, because if the evidence is factually sufficient to support a ruling, then it is necessarily legally sufficient to do so. *See In re J.E.*, No. 02-23-00141-CV, 2023 WL 5115202, at *2 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op.); *In re N.R.*, No. 02-14-00333-CV, 2015 WL 1120317, at *3 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (per curiam) (mem. op.).

Analyzing the factual sufficiency of the evidence involves two inquiries: whether the trial court had enough information to exercise its discretion and, if so, whether the trial court's decision was reasonable based on that information. *See*

19

*R.R.K.*, 2022 WL 1257136, at *4. We must consider and weigh all of the pertinent evidence to determine whether the credible evidence supporting the challenged finding is so weak or the finding is so contrary to the overwhelming weight of the evidence that it is unreasonable and must be set aside. *Id.*; *In re E.D.*, No. 02-20-00208-CV, 2022 WL 60781, at *11 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.).

Throughout our sufficiency review, we remain cognizant that "conservatorship determinations are intensely fact driven" and that the trial court "is in the best position to observe the demeanor and personalities of the witnesses and [to] feel the forces, powers, and influences that cannot be discerned by merely reading the record." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (internal quotation marks omitted) (first quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); and then quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)); *see Vanderbol v. Vanderbol*, No. 02-23-00230-CV, 2024 WL 1925141, at *9 (Tex. App.—Fort Worth May 2, 2024, pet. denied) (mem. op.). The trial court is the sole arbiter of the witnesses' credibility, and we cannot second-guess its credibility determinations or replace them with our own. *In re L.B.*, No. 02-19-00345-CV, 2020 WL 1808486, at *6 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.); *In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *6 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (mem. op.).

20

## 2. Changed-Circumstances Finding

Mother first argues that the trial court erred by finding that the circumstances had materially and substantially changed. But Mother herself sought modification of the custody arrangement based on changed circumstances.

In Mother's counterpetition to modify, she pleaded that "[t]he circumstances of the children, a conservator, or other party affected by the order . . . have materially and substantially changed since the date of rendition." And "[o]ne party's allegation of changed circumstances of the parties constitutes a judicial admission of the common element of changed circumstances of the parties in the other party's similar pleading." *In re R.M.*, No. 02-18-00367-CV, 2019 WL 2635566, at *3 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.); *In re C.H.*, No. 02-13-00312-CV, 2014 WL 3891636, at *4 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (per curiam) (mem. op.); *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.). Mother thus judicially admitted the fact that the circumstances had materially and substantially changed, and she is barred from challenging the sufficiency of that finding on appeal. *See R.M.*, 2019 WL 2635566, at *3 (holding mother was barred from challenging evidentiary sufficiency of changed circumstances because her counterpetition to modify judicially admitted the element); *C.H.*, 2014 WL 3891636, at *4 (similar); *A.E.A.*, 406 S.W.3d at 410–11 (similar).

Even if Mother had not judicially admitted the changed circumstances, though, she does not challenge all of the bases for that finding. Mother takes issue with two of

the changes listed in the trial court's findings and conclusions: that she had "failed to meet [Uriah's] medical and educational needs" and that Partner "posed a risk to the welfare of the children." But the trial court also found that "[t]he circumstances of [Father], [Mother], [Owen], and [Uriah] ha[d] materially and substantially changed" because Mother had "relocated several times, . . . [M]other [had] remarried, [and M]other [had] engaged in a relationship with [Partner] while being married." Mother does not deny that any of these events occurred; indeed, she admitted them at trial. And these three events—relocation, remarriage, and an alteration of the children's home environment—are classic examples of changes that have been held to be "material" for purposes of a custody modification. *See In re J.A.R.*, No. 2-04-123-CV, 2005 WL 2839107, at *7 (Tex. App.—Fort Worth Oct. 27, 2005, no pet.) (per curiam) (mem. op.); *see also In re K.A.M.S.*, 583 S.W.3d 335, 342 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Material changes may include: the marriage of one of the parties, changes in the home surroundings, mistreatment of the child by a party, or a party's becoming an improper person to exercise custody."). Such undisputed facts provided strong support for the trial court's reasonable conclusion that there had been a material and substantial change in the family's circumstances—regardless of what other changes the court may have found. *See* Tex. Fam. Code Ann. § 156.101(a)(1).

For both reasons, we overrule this portion of Mother's sufficiency issue.

22

### 3. Best-Interest Finding

Mother also challenges the trial court's finding that the modification was in the children's best interest.[23]

The children's best interest is the "main ground that a movant must prove" to support a modification, *R.R.K.*, 2022 WL 1257136, at *5, as "[t]he best interest of the child[ren] shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child[ren]," Tex. Fam. Code Ann. § 153.002. Multiple factors are relevant to this determination, including the children's emotional and physical needs, the parents' parental abilities, the stability of the parents' homes, any acts or omissions by the parents indicating that the parent–child relationship is improper, and any excuses for those acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The trial court has "wide latitude" in analyzing these factors and determining the children's best interest. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re C.M.C.*, No. 02-10-00260-CV, 2011 WL 1532395, at *9 (Tex. App.—Fort Worth Apr. 21, 2011, no pet.) (mem. op.); *Vasquez v. Vasquez*, No. 2-09-218-CV, 2010 WL 2243581, at *2 (Tex. App.—Fort Worth June 3, 2010, no pet.) (mem. op.).

Mother contends that the modification was not in the children's best interest because no reasonable factfinder could have believed Father's testimony or

---

[23]Rather than targeting a specific aspect of the modified custody arrangement, Mother broadly attacks the modification as a whole.

23

interpreted Partner's social-media posts as violent rhetoric rather than tongue-in-cheek jokes. She thus reasons that the trial court's modification decision must be attributable to the "pro-transgender content" of Partner's speech and that the decision discriminated against Partner and violated his right of free speech.[24] But the premises underlying Mother's argument ignore the trial court's role as "the sole judge of the credibility of witnesses and the weight to be given to their testimony." *C.H.*, 2014 WL 3891636, at *3.

While Mother asserts that it was unreasonable for the trial court to believe Father's testimony and evidence over hers,[25] resolving such factual conflicts was the trial court's prerogative. *See F.A.*, 2017 WL 632913, at *6 (noting that appellate court must "defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions"). Mother and Father presented differing descriptions of one another's misdeeds and of the children's medical and educational needs, with no overwhelming evidence to mandate a finding in either parent's direction. The trial court—having "observe[d] the

[24]Portions of Mother's brief also allege that the trial court's modification violated Mother's freedom of association and right to due process. All of these assertions rely on the same faulty premises discussed herein.

[25]Mother targets Father's descriptions of Owen's medical incidents in particular, claiming that Owen's medical records revealed the falsity of Father's testimony. But different portions of the medical records were consistent with different aspects of each parent's testimony. More to the point, the records did not overwhelmingly demonstrate what Mother implies: that any inconsistencies in Father's testimony were intentional lies that undermined his credibility as a matter of law.

demeanor and personalities of the witnesses," *J.J.R.S.*, 627 S.W.3d at 218—was free to believe Father's testimony.[26] And "when[, as here,] the testimony of witnesses is conflicting, this court will not disturb the credibility determinations made by the factfinder." *C.M.C.*, 2011 WL 1532395, at \*9; *Vasquez*, 2010 WL 2243581, at \*2; *see Vanderbol*, 2024 WL 1925141, at \*9 (noting that trial court is in best position to determine custody issues because it "faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent" (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)). Apart from Mother's disagreement with the trial court's assessment of Father's credibility, she has not identified any reason why it was objectively unreasonable.

The same is true of Mother's contention that "[n]o reasonable person would take [Partner's social-media] statement[s] seriously."[27] True, Partner claimed that most

---

[26]In her sufficiency argument, Mother repeatedly references evidence that was offered in support of her motion for new trial. Such evidence is beyond the scope of the sufficiency review. *See In re D.L.W.W.*, 617 S.W.3d 64, 92 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("Although we recognize that the trial court and the parties in this proceeding had many hearings before the date of trial, . . . [t]he only evidence that can support the trial court's order is the evidence admitted at trial."); *In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.) (similar).

[27]To the extent that Mother asserts that Partner's constitutional protections prohibited the trial court from considering the social-media posts as evidence at all, Mother made no such objection at trial. *See* Tex. R. App. P. 33.1(a)(1). In fact, the trial court was the one to note its concern that several of Partner's Twitter posts appeared to be "permissible political statement[s]" or "remote in time," and it did so to explain why it was excluding them from evidence. The court stated that it was not admitting Partner's social-media posts as exhibits unless the parties could "tie [them] into the

25

of his social-media posts were intended as jokes, but even he conceded that some of the posts were serious. And Father's testimony demonstrated that Partner's social-media statements had real-world consequences, including Father's losing his job. After hearing this evidence, observing Partner's demeanor as he testified, and reading the social-media posts, the trial court expressly stated that it "didn't find [Partner] . . . credible on [whether his comments] . . . w[ere] humorous." Once again, this credibility assessment was the trial court's to make.[28] *See Vanderbol*, 2024 WL 1925141, at *9.

Plus, even without Father's disputed testimony or Partner's social-media posts, there was other, undisputed evidence that supported the trial court's best-interest finding:

- Mother admitted that she had failed to surrender possession of the children for Father's scheduled visitations on multiple occasions;

- Mother had relocated or dramatically altered the children's home environment multiple times, first allowing Partner to live with them, then marrying and

---

father or where the act is so extreme that it appears to be calling for . . . the immediate killing of people."

Regardless, Mother has not cited any case law to support her contention that a trial court violates a non-party's constitutional rights by taking his pattern of public statements into account when determining the best interest of children that share his home.

[28]Even Mother acknowledges that some people could find Partner's social-media posts offensive, i.e., that not everyone views them as jokes.

moving in with Husband, then moving out of Husband's home, and then allowing Partner to live with them again;[29] and

- Mother had allowed Partner to live with her and the children despite Partner's previous work as a prostitute, despite a previous FBI raid on his home, and despite the allegations of rape lodged against him.

Taking this together with the disputed evidence that the trial court reasonably credited in favor of the modification, there was sufficient probative evidence to support the trial court's conclusion that modification was in the children's best-interest. *See R.R.K.*, 2022 WL 1257136, at *4. Because this conclusion was neither lacking in evidentiary support nor an abuse of discretion, we overrule Mother's sufficiency issue.

## B.    Time-Management Rules: No Preservation

Mother next claims that, even if the evidence was sufficient to support the modification order, the trial court abused its discretion by imposing the two-rounds-each rule and the fifteen-minute limit on her testimony. She claims that these time-management rules "muzzl[ed]" her, denied her due process, and violated "Texas Rules of Evidence 611, Government Code 74.093, Rule[] of Civil Procedure[] Rule 3a, and Judicial Cannon 3, No. 8." But Mother did not preserve any of these challenges.

---

[29]Because Mother's cohabitation with Partner was relevant to the children's best interest regardless of whether the Morality Clause was enforceable, Mother's enforceability-related arguments are moot.

### 1.     Standard of Review and Governing Law

Trial courts have great discretion in the conduct of a trial and "may properly intervene to . . . expedite the trial[] and to prevent what it considers to be a waste of time." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001); *see* Tex. R. Evid. 611(a)(2) (stating that a trial court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time"); *Stroik v. Stroik*, No. 02-22-00092-CV, 2023 WL 6475645, at *2 (Tex. App.—Fort Worth Oct. 5, 2023, pet. denied) (mem. op.) (recognizing that a trial court may "control the presentation of evidence so as to avoid needless consumption of time"). If a party takes issue with a trial court's time-management rules, the party must preserve its complaint by raising a timely objection, obtaining an adverse ruling, and either making an offer of proof or filing a bill of exception to document the evidence that it was prevented from presenting. *See* Tex. R. App. P. 33.1(a), 33.2; *In re L.C.*, No. 05-23-00632-CV, 2024 WL 5001934, at *6–7 (Tex. App.—Dallas Dec. 6, 2024, no pet. h.) (mem. op.) ("When a trial court limits the amount of time a party has to present its case, and thereby prevents a party from presenting all of its evidence, the party must object to the time limit and make an offer of proof of the evidence it was prevented from presenting to preserve error on appeal."); *E.J. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-18-00473-CV, 2018 WL 6627720, at *5–6 (Tex. App.—Austin Dec. 18, 2018, pet. denied) (mem. op.) (similar); *Goss v. Goss*, No. 04-16-00809-CV, 2018 WL 340139, at *2 (Tex. App.—San Antonio Jan. 10, 2018, pet. denied) (mem.

op.) (similar); *see also Dow Chem. Co.*, 46 S.W.3d at 240–41 (holding court of appeals erred by overlooking appellant's failure to preserve challenge to trial court's comments regarding trial administration).

### 2. Lack of Preservation

Although Mother now complains of the trial court's two-rounds-each rule, she did not object to it at any point during trial. *See* Tex. R. App. P. 33.1(a)(1). In fact, the one time that Mother sought an exception to the rule—asking that she be allowed to retake the stand in her case-in-chief—the trial court granted the exception. And although Mother now complains of the time-limited nature of the exception, once again, she did not raise her objection below. *See id.*

Moreover, even if Mother had objected to both of these time-management rules, and even if she could show that the trial court abused its great discretion by imposing them, Mother failed to make an offer of proof or file a bill of exception. *See* Tex. R. App. P. 33.2; *L.C.*, 2024 WL 5001934, at *7 (holding father failed to preserve challenge to trial time limits when he objected but failed to make an offer of proof or file a bill of exception); *E.J.*, 2018 WL 6627720, at *6 (holding mother failed to preserve due-process challenge to trial time limits when she objected but did not make an offer of proof or file a bill of exception). We thus have no way of knowing what evidence the limitations allegedly prevented Mother from presenting.[30]

---

[30]Mother's motion for new trial did not identify the substance of the allegedly excluded testimony either. *See Johnson v. Paxton*, No. 02-22-00459-CV, 2023 WL

Even now—long after the time for an offer of proof or bill of exception—Mother identifies just one witness that she claims was affected by the two-rounds-each rule: Husband.[31] But she does not detail the testimony that Husband would have offered, much less how such testimony would have changed the trial's outcome. *See Johnson*, 2023 WL 5115303, at *5–6 (holding husband could not show that time limits harmed him because he "ha[d] not identified any specific witnesses or other evidence that he was prevented from presenting because of the time limits, much less shown that the exclusion of such evidence probably led to an improper result").

And as for the fifteen-minute limit on Mother's testimony, Mother points to several new-trial exhibits that she claims she would have offered at trial had her testimony not been time-limited, but many of those exhibits either were or contained inadmissible hearsay. Plus, Mother does not explain why the time-limited nature of her third round of testimony prevented her from offering the relevant exhibits in either of her first two rounds of testimony (or, for that matter, through another witness).

---

5115303, at *6 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op.) (noting that husband could have used motion for new trial to "show what evidence, if any, the trial court's time limits prevented him from presenting," but he failed to do so).

[31]Mother does not identify Husband by name but by "Weber." "Weber" is not the name of any witness in the record, and when Father responded to Mother's brief, he noted that he "does not know a . . . Weber." However, Mother uses the name "Weber" elsewhere in her brief when describing facts involving Husband, so we interpret Mother's references to "Weber" as referring to Husband.

In short, Mother did not preserve her complaint regarding either of the two time-management rules that she challenges on appeal. We overrule this issue.

## C.   Motion for New Trial: No Abuse of Discretion

In her third and final issue, Mother asserts that the trial court abused its discretion by denying her motion for new trial.

### 1.   Standard of Review and Governing Law

A party moving for a new trial based on newly discovered evidence has the burden of establishing that (1) the evidence came to her knowledge after trial; (2) her failure to discover the evidence earlier was not due to her lack of diligence; (3) the evidence is not merely cumulative or impeachment evidence; and (4) the evidence is so material that it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010); *see Askew v. Askew*, No. 2-04-109-CV, 2005 WL 2471539, at *4 (Tex. App.—Fort Worth Oct. 6, 2005, no pet.) (mem. op.). We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Askew*, 2005 WL 2471539, at *4.

### 2.   Mother's Motion and Reliance on *C. v. C.*

Although Mother moved for a new trial based on new evidence, she acknowledged that her evidence was not newly discovered. Rather, Mother's new-trial evidence had not been presented by her trial counsel despite his awareness of it. Nonetheless, Mother argued below—as she does on appeal—that the "ordinary rules restricting the granting of a new trial for newly discovered evidence should not be

applied rigidly in child custody proceedings" and that, regardless of a party's lack of diligence, a new trial must be granted if the modification order would have a "serious adverse effect" on the children. To support this relaxed standard, Mother points to a non-binding, almost-half-century-old case from our sister court of appeals: *C. v. C.*, 534 S.W.2d 359 (Tex. App.—Dallas 1976, writ dism'd w.o.j.).[32]

In *C. v. C.*, the Dallas Court of Appeals held that because the children's best interest is paramount in custody proceedings, a trial court must consider new-trial evidence that bears on the children's best interest regardless of a party's fault in failing to present it at trial. *Id.* at 361–62. There, the father was appointed as managing conservator, and the mother supported her new-trial motion with affidavits detailing the father's "violent temper" and "cruel[]," abusive behavior—behavior that the mother had not offered evidence of at trial. *Id.* at 360–62. Without considering the affidavits or conducting a hearing, the trial court overruled the motion. *Id.* The court of appeals held that this was error because if "evidence presented in support of the motion[] and not offered at the original trial[] strongly shows that the original custody order would have a seriously adverse effect on the interest and welfare of the children[] and that presentation of such evidence at another trial would probably change the result," then a new trial must be granted. *Id.* at 362.

_____

[32]Mother also cites *Hefley v. Hefley*, 859 S.W.2d 120 (Tex. App.—Tyler 1993, no writ), as support for the relaxed standard, but although *Hefley* cited *C. v. C.* with approval, that case involved "newly discovered evidence" that satisfied the traditional new-trial standard. *Hefley*, 859 S.W.2d at 124–25.

Mother claims that she—like the mother in *C. v. C.*—supported her motion for new trial with evidence that the custody modification would have a seriously adverse effect on the children. But even if we put aside the non-binding nature of *C. v. C.*, it does not apply here.

First and foremost, *C. v. C.* involved an imminent threat of physical abuse by the children's managing conservator, and the Dallas Court of Appeals cautioned that its relaxation of the diligence requirement was limited to such "extreme case[s]." *Id.* at 361–62. There is no evidence of a similar threat or "extreme" circumstance in this case. *See id.* at 361; *see also Martin v. Martin*, No. 09-94-370-CV, 1995 WL 599023, at *6 (Tex. App.—Beaumont Oct. 12, 1995, no writ) (not designated for publication) (distinguishing *C. v. C.* and explaining that "[t]here is no evidence presented . . . that suggests violence upon, abuse of, or even danger to the two minor children"). Both children confirmed that they had not been abused, and at trial, Mother candidly testified that she believed Father loved the children and that she "wouldn't say" he was "a bad father."

Second, in *C. v. C.*, our sister court clarified that a key aspect of the trial court's error was that, rather than setting a hearing on the mother's new-trial motion, the court "refuse[d] to [even] consider the [new-trial] evidence on the ground that the party tendering it had not been diligent in presenting it." *C.*, 534 S.W.2d at 362. Here, the trial court did not reject Mother's motions for new trial out of hand. Although it ruled that her lack of diligence rendered a significant portion of her evidence

inadmissible,[33] it nonetheless allowed Mother to present that evidence as offers of proof in two separate hearings. It was at the conclusion of the final hearing—after the court had heard Mother out—that it denied her motion for new trial and reaffirmed that "it was in the best interest of the children to make [the] decision [it] made." And "[w]here, as here, a case is tried to the bench, the trial judge is in an excellent position to determine whether the evidence in question would probably change the outcome of the trial." *Askew*, 2005 WL 2471539, at *5.

On top of that, much of Mother's new-trial evidence was inadmissible for reasons unrelated to her lack of diligence—and it would have been inadmissible even if it had been offered at the original trial. The trial court sustained various hearsay, relevance, predicate, and other objections to Mother's new-trial evidence, either excluding it from consideration on that basis or supplementing the grounds for its exclusion when it was being presented as an offer of proof. Mother has not challenged these rulings, yet she continues to rely on the excluded evidence on appeal, arguing that a new trial was required based on, for example, a psychological evaluation that was excluded as hearsay and a social study that was excluded as hearsay.[34]

---

[33]Although the trial court excluded much of Mother's new-trial evidence because she had not offered it at trial, given Mother's reliance on *C. v. C.*, we broadly construe her appellate complaint to include a challenge to that ruling. Even broadly construed, though, Mother's appeal does not challenge any of the trial court's other evidentiary rulings.

[34]Mother also relies on excluded evidence of post-judgment events, even though she does not challenge that evidence's exclusion on appeal. To the extent that

34

Nothing in *C. v. C.* negated the Rules of Evidence. *See C.*, 534 S.W.2d at 360–62 (discussing affidavits describing father's pattern of physical and verbal abuse of children). Even under *C. v. C.*, the trial court was not required to grant a new trial based on inadmissible evidence.[35]

For all of these reasons, Mother's reliance on *C. v. C.* is misplaced, and she has failed to demonstrate that the trial court's denial of her motion for new trial was an abuse of discretion. We overrule her final issue.

---

she interprets *C. v. C.* to require consideration of post-judgment evidence as well, *C. v. C.* did not involve evidence that came into existence after trial. *See C.*, 534 S.W.2d at 360–62.

[35]Mother overextends another aspect of *C. v. C.* as well: she seemingly interprets the case to lower the threshold for reversal such that evidence calling one party's credibility into question requires a new trial. Mother thus dedicates much of her appellate argument to new-trial exhibits that she claims demonstrate Father's "lies" and false reports. But *C. v. C.* did not hold that cumulative impeachment evidence could force a trial court to grant a new trial, and Texas courts have recognized the contrary rule since this state's days as a Republic. *See McDonald v. Hancock* (Tex. 1845), 65 Tex. L. Rev. 388, 389 (Paulsen rep. 1986) (affirming denial of motion for new trial and reciting rule that newly discovered evidence must "go[] to the merits and not to the impeachment of the character of witnesses used in the trial, and generally that it is not merely cumulative of the evidence used in the former trial"); *Watts v. Watts*, 396 S.W.3d 19, 23 (Tex. App.—San Antonio 2012, no pet.) (reiterating that "a trial court does not abuse its discretion in denying a motion for new trial if the newly discovered evidence is to be used for purposes of impeachment" and rejecting parent's argument that "the newly discovered evidence was material in assessing [the other parent's] credibility").

### III. Conclusion

Having overruled all of Mother's issues, we affirm the trial court's modification judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 6, 2025